**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Randy Lamont PATTERSON aka Randy Brown, Marcus Wayne Edmundson, Tony Burton, Don Grogans, and Billy Ray Brown, Defendants-Appellants.**

**Nos. 85–1236, 85–1237, 85–1238, 85–1239 and 85–1240.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 16, 1987.

Decided June 15, 1987.

Marcus S. Topel, Gregory D. Guy-Smith, San Francisco, Cal., Kurt Seibert, John Williams, San Jose, Cal., Charles Gretsch, San Francisco, Cal., Paul Delano Wolf, Oakland, Cal., for defendants-appellants.

Sanford Svetcov, San Francisco, Cal., for plaintiff-appellee.

Before ANDERSON, SKOPIL and CANBY, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

This appeal involves a multiplicity of issues, all spawned from the prosecution of a heroin distribution conspiracy. We affirm the convictions and the sentences, recognizing the district judge's outstanding efforts in conducting such a complex and exhaustive trial.

## I. BACKGROUND

Unless otherwise stated in the text of this opinion, the facts are substantially as follows: Early in 1976, a criminal enterprise subsequently identified as "the Mob" began to deal heroin in San Antonio Village, a housing project in Oakland, California. The enterprise was masterminded and controlled by Felix Mitchell ("Mitchell"), the notorious "kingpin" of the enterprise. He structured the Mob as an organization and directed its covert heroin distribution activities in Oakland and in other cities. The organization was structured in such a manner that the twenty to twenty-five members served in a hierarchy of authority. Some members actually distributed the heroin on the streets, others collected the payments, while others acted as lookouts during the sales and notified the sellers on the streets of approaching police cars or undercover police officers. The organization used signals and walkie-talkies to notify the street sellers and to communicate with them during the heroin distribution periods. The proceeds from the heroin sales were delivered throughout each day to other members of the Mob up through the hierarchy. When Mitchell, at the apex of the hierarchy, received the proceeds, he would distribute payments to the Mob members for their participation.

The Mob became a lucrative organization, at times making up to $15,000 per day as a result of the heroin sales. To secure its sales areas, the Mob engaged in coercive activities which often erupted into "drug wars" with rival heroin distribution organizations. These activities included the slayings of Carlos Dorantes, Sandra Adamson, Vendetia Davis, Red Walker, Ricky Walker, Terry Hatter, and Charles Dorsey. Two other individuals, Helen Campbell ("Campbell") and Alvin Gay, were also shot, but survived the gunshot wounds they received.

The defendants, Randy Brown ("Patterson"), Marcus Wayne Edmundson ("Edmundson"), Tony Burton ("Burton"), Don Grogans ("Grogans"), and Billy Ray Brown ("Brown") were charged with conspiracy to distribute heroin under 21 U.S.C. § 846. At trial, three former members of the Mob, Fred Sanders ("Sanders"), Norbert Bluitt ("Bluitt"), and Leslie Brigham ("Brigham"), who had become Federal Witness Protection Program witnesses for the government, testified to the heroin sales of the Mob, its distribution scheme and its participants and coercive activities, including the homicides. The evidence at trial consisted of the testimony of the Protection Program witnesses, other documentary evidence, extrinsic evidence, police reports and the testimony of additional witnesses.

After a mistrial, a second trial was held which resulted in the defendants being convicted under 21 U.S.C. § 846 of conspiracy to distribute heroin. Felix Mitchell, who was tried with the defendants, was convicted of conspiracy to distribute heroin, as well as directing a criminal enterprise, tax evasion, and failure to file tax returns. With the exception of Don Grogans, all of the defendants received enhanced sen-

tences as Dangerous Special Drug Offenders. Defendants Randy Patterson, Marcus Wayne Edmundson, Tony Burton, and Don Grogans jointly appeal the issues of severance, the admission of the Witness Protection Program witness testimony, the admission of coconspirator evidence as a violation of the right to confrontation, the admission of "obstruction of justice" evidence, and the denial of a motion for a new trial. Billy Ray Brown separately appeals the same issues. Patterson, Grogans, and Brown individually appeal denial of their motions to sever. Defendants also individually appeal specific alleged errors as set forth herein.

## II. DISCUSSION

### A. SEVERANCE

Before trial, each of the defendants moved to sever their trial from that of Mitchell. The district court denied the motion.

#### 1. Standard of Review

We review the denial of a motion to sever under Fed.R.Crim.P. 14 for abuse of discretion. *See United States v. Mills,* 597 F.2d 693, 696 (9th Cir.1979). The test for abuse of discretion by the district court is "whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Abushi,* 682 F.2d 1289, 1296 (9th Cir. 1982); *see also United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

#### 2. Severance from Mitchell

The defendants argue they should not have been tried with Mitchell because the evidence introduced showing his assets and income with respect to his tax evasion was irrelevant to their charge of conspiracy. In this, the defendants also posit that evidence of Mitchell's wealth was unduly prejudicial because without it the jury would not have found that the defendants were part of a conspiracy led by Mitchell.

The law regarding joinder of defendants is quite clear. *See* Fed.R.Crim.P. 8(b). "Joinder of multiple defendants is proper only if all of the offenses charged in the indictment arose out of the same series of transactions." *United States v. Davis,* 663 F.2d 824 (9th Cir.1981) (quotations omitted). A defendant charged with tax violations may be tried with other individuals charged in the same conspiracy if "[e]ven without the income tax counts evidence of the [ ] financial transactions would have been admissible...." *United States v. Anderson,* 642 F.2d 281, 284–85 (9th Cir.1981). Evidence of unexplained wealth is relevant in a narcotics conspiracy case if it creates a reasonable inference that the unexplained wealth came from the narcotics conspiracy. *See United States v. Jabara,* 618 F.2d 1319, 1321 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 70 (1980).

Here, evidence of the tax violations related directly to the conspiracy since it was the monetary evidence, the handling of large sums of money up through the hierarchy, which demonstrated the scheme of illegality. Also, Mitchell's wealth was a result of the heroin distribution plan carried out by the defendants and each of the Witness Protection Program witnesses identified each of the defendants as acting on behalf of Mitchell either as a street seller, distributor, money collector, lookout, or as one who protected the distribution scheme. Moreover, the defendants provide no explanation as to why the jurors could not fairly "compartmentalize" the conspiracy and tax evasion evidence and charges in their deliberations. *See United States v. Ramirez,* 710 F.2d 535, 546 (9th Cir.1983). As a result, we cannot say the district court abused its discretion under Fed.R. Crim.P. 14 in denying the motions to sever. Furthermore, joinder of the defendants was proper under Fed.R.Crim.P. 8(b) since, even if error could be assumed to have occurred, it was harmless and failed to have any substantial influence on the verdict. *See United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (citing *Kotteakos v. United States,*

328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

### 3. Individual Severance

In addition to the motions to sever from Mitchell, defendants Patterson, Brown, and Grogans individually moved to sever their trial from that of the other defendants. Their motions were denied by the district court on the grounds of judicial economy and that the defendants were charged with being a part of a conspiracy even if they had not participated in all of the overt acts the conspiracy committed.

The government conceded Patterson, Brown, and Grogans withdrew from the conspiracy by the end of 1980. [Resp. Br. at 46]. On this basis, Patterson, Brown, and Grogans argue their trial should have been severed from the other defendants' for two reasons: (1) their absence from the conspiracy after 1980 created a variance in proof—that two conspiracies rather than one were shown, and (2) even if only one conspiracy was shown, the post–1980 evidence was unduly prejudicial.

#### (a) Conspiracy

■ Viewing the evidence most favorably to the prosecution, we must decide whether any rational juror could have found a single conspiracy beyond a reasonable doubt. *See United States v. Fleishman*, 684 F.2d 1329, 1340 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). A single conspiracy exists, as compared with multiple conspiracies, where there is " 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *United States v. Arbelaez*, 719 F.2d 1453, 1457 (9th Cir.1983), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984) (quoting *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341; 450 U.S. 985, 101 S.Ct. 1525, 67 L.Ed.2d 821; 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981)). A single conspiracy may include subgroups or subagreements. *Id.* The evidence need not exclude every hypothesis other than a single conspiracy

exists. *Arbelaez*, 719 F.2d at 1457– 58 (citing *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981)).

■ After first indicating that the conspiracy ended in 1980 when four members of the Mob were arrested in Sacramento, Norbert Bluitt also testified that the Mob's operation had not really ended but that he and other members "kept it going." (E.R. 58). A review of the record also shows that other witnesses indicated that many of the same Mob members ran the same illegal transactions after 1980. This evidence is substantial and indicates that a rational juror could have concluded that there was one overall agreement, explicit or otherwise, to engage in a single overall conspiracy. *See United States v. Moran*, 759 F.2d 777, 784 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986); *Arbelaez*, 719 F.2d at 1458. As a result, there was no material variance.

#### (b) Prejudice

■ The contention that the post–1980 evidence was unduly prejudicial to Patterson, Brown, and Grogans in light of their leaving the conspiracy presents a close question. However, the district court did not abuse its discretion in denying the motion to sever. We find Patterson, Brown, and Grogans have not carried their heavy burden in demonstrating that their joinder with the other defendants was " 'so manifestly prejudicial that it outweighed the dominant concern with judicial economy.' " *United States v. Douglass*, 780 F.2d 1472, 1478 (9th Cir.1986) (quoting *United States v. Monks*, 774 F.2d 945, 948 (9th Cir.1985) quoting in turn *United States v. Armstrong*, 621 F.2d 951, 954 (9th Cir.1980)).

■ While Patterson, Brown, and Grogans possibly would have had a better chance of acquittal without the post–1980 evidence of the Mob's acts, including a number of slayings, shootings and coercive activities in addition to the continuing heroin distribution scheme, this is insufficient for an adequate showing of prejudice. There must be "clear, manifest, or undue" prejudice to justify severance. *Escalante*,

637 F.2d at 1201. Great disparity in the amounts of evidence introduced against joint defendants may, in rare cases, be grounds for severance, *see, e.g., United States v. Donaway*, 447 F.2d 940, 943 (9th Cir.1971). But where, as here, the district court uses great diligence in instructing the jury to separate the evidence,[1] severance is unnecessary because the prejudicial effects of the evidence of codefendants are "neutralized." *Douglass*, 780 F.2d at 1479. Moreover, the prejudice here did not result in violation of the substantive rights of Patterson or Grogans because of antagonistic defenses, *United States v. Polizzi*, 801 F.2d 1543, 1554 (9th Cir.1986), lack of separate counsel or the denial of confrontation rights. *Douglass*, 780 F.2d at 1478; *U.S. v. Sutton*, 794 F.2d 1415, 1420 n. 2 (9th Cir.1986); *Escalante*, 637 F.2d at 1201. The district court did not abuse its discretion in denying Patterson's and Grogans' motions for severance.

## B. EVIDENTIARY ERROR

Evidentiary rulings are reviewed under the abuse of discretion standard. *United States v. Soulard*, 730 F.2d 1292, 1296 (9th Cir.1984).

### 1. Admission of Coconspirator Testimony

The defendants contend the district court erred in admitting the testimony of Sanders, Bluitt and Brigham. Error is alleged on three bases: (a) the testimony was not within the scope of Fed.R.Evid. 801(d)(2)(E) as a statement by a coconspirator, (b) the testimony violated the sixth amendment's confrontation clause, and (c) the government failed to show in good faith that the hearsay declarant was unavailable.

### (a) Scope of Rule 801(d)(2)(E)

An out-of-court statement by a coconspirator is admissible under Rule 801(d)(2)(E)[2] as nonhearsay if the statement satisfies a tripartite test. First, there must be independent proof of the existence of the conspiracy. *United States v. Mouzin*, 785 F.2d 682, 692 (9th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 574, 93 L.Ed.2d 577 (1986). Second, the statement must have been in furtherance of the objectives of the conspiracy. *Id.* Third, the statement must have been made in the course of the conspiracy. *Id.* We review independent proof of a conspiracy *de novo* and a district court's conclusion that a statement was in furtherance and during the course of a conspiracy is upheld unless clearly erroneous. *United States v. Smith*, 790 F.2d 789, 794 (9th Cir.1986).

Bluitt testified that Herb Lester, a codefendant not a party to this appeal, made inculpatory statements to him about the Mob's actions in the Walker murders. Bluitt also testified to similar statements made by Patterson, Edmundson, and Billy Ray Brown, and that Burton had "bragged" about the murders. Similarly, Brigham testified that Mitchell told him that members of the Mob took a trip to Los Angeles in order to conceal the murders of Sandra Adamson and Vendetia Davis. Sanders followed Bluitt's and Brigham's testimony, stating that he also gained his information with respect to the murders through statements made by the defendants.

Independent proof of the conspiracy was shown. Officers patrolling the area made numerous observations of the Mob's communication system at work. Members of the Mob, including Mitchell, were found in possession of heroin. Also, undercover agents who purchased heroin from Patterson and other members of the Mob identified the defendants as members of the Mob and Bluitt, Brigham and Sanders as partici-

---

1. The district court instructed the jury as follows:

 In determining whether one or more of these defendants was a member of the charged conspiracy prior to 1981, you must completely disregard all of the activity, statements or other evidence concerning the years 1981 to 1983. Such evidence is inadmissible as to defendants

Randy Brown [Patterson], Billy Ray Brown and Donald Grogans.

2. Fed.R.Evid. 801(d)(2)(E) provides that a statement is not hearsay if the statement is offered against a party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

pants working together in the heroin distribution scheme. We need not recount the entire record here, since this independent evidence is more than adequate to show the existence of a heroin sales conspiracy.

A review of the record also indicates that the statements were unquestionably in furtherance of the conspiracy. The conspiracy consisted of the heroin distribution scheme. To carry out the scheme, the Mob engaged in coercive activities, including the murder of the Walker brothers, Adamson and Davis. The Walkers and Adamson were killed because they were working for a rival heroin ring. Davis was also killed because she was believed to be part of "the Family," a gang competing with the Mob.

While the statements by Lester, Burton and Brown about the murders did not *per se* advance the conspiracy, they were nevertheless admissible. Lester's statement was admissible as a declaration against interest under Fed.R.Evid. 804(b)(3). Lester was unavailable, and the statement clearly tended to subject him to criminal liability. *See United States v. Layton*, 720 F.2d 548, 559 (9th Cir.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). Even assuming, without deciding, that corroboration was required for admission of Lester's inculpatory statement, *see United States v. Stratton*, 779 F.2d 820, 828 n. 7 (2d Cir.1985), ample corroboration existed in evidence of the manner of the Walkers' deaths. The statements of Burton and Brown were admissible against them as admissions. Fed. R.Evid. 801(d)(2)(A).

Those statements that were admitted as coconspirators' statements were made during the course of the conspiracy. It was established that the conspiracy began in early 1976 and continued until long after 1980 when the statements were made.

**(b) Confrontation Rights**

The defendants' contention that the Bluitt, Brigham and Sanders testimony violated their confrontation rights because the government did not produce Herbert Lester as a witness is without merit. In *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Supreme Court held the confrontation clause is not violated by the admission of an out-of-court statement by a coconspirator, *Inadi*, 106 S.Ct. at 1126–27, since statements made during a conspiracy have evidentiary significance that cannot be replicated by in-court testimony. *United States v. Bernard S.*, 795 F.2d 749, 754 (9th Cir.1986) (citing *Inadi*, 106 S.Ct. 1126–27).

**(c) Unavailability Requirement**

Given that the defendants can present no confrontation clause violation, *Inadi*, 106 S.Ct. at 1126, it follows that the government had no duty to show in good faith that Lester, as the hearsay declarant, was unavailable.

**2. Admission of Campbell Shooting Incident**

Patterson and Brown contend that the district court abused its discretion by admitting evidence of the shooting of Helen Campbell. They argue that the evidence of the shooting was not relevant to nor in furtherance of the charged conspiracy. They further argue that even if relevant, the shooting incident should have been excluded under Fed.R.Evid. 403 as unfairly prejudicial.[3]

The indictment in this case charged the defendants, including Patterson, with conspiracy to sell heroin. The indictment alleged that the defendants used "force, fear and intimidation to insure [sic] discipline among its members, and to maintain and expand its heroin distribution areas." The

---

**3.** Patterson also contends that the evidence of the shooting should have been excluded under Fed.R.Evid. 404(b) as an improper use of an additional bad act. A district court's decision regarding the admission of evidence pursuant to Rule 404(b) is reviewed for an abuse of discretion. *United States v. Gwaltney*, 790 F.2d 1378, 1382 (9th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987). The district court did not abuse its discretion in admitting evidence of the shooting which was offered "for other purposes, such as proof of ... plan," Fed.R.Evid. 404(b), in this case, a conspiracy.

indictment also alleged, as an overt act, that Patterson shot Campbell.

 Since the indictment charged that the defendants used violence to maintain control, and the shooting incident was an example of that pattern of violence, we find that the district court did not abuse its discretion in finding the evidence was relevant to and in furtherance of the conspiracy. *See United States v. Meester,* 762 F.2d 867, 874–75 (11th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985) (evidence of a coconspirator's homicide relevant to show existence of drug conspiracy).[4]

 Patterson argues that even if the shooting incident is relevant, it should have been excluded as unfairly prejudicial pursuant to Fed.R.Evid. 403. Relevant evidence can be excluded under Rule 403 if the trial court finds that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. Rule 403 has been characterized, however, "as an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence." *Meester,* 762 F.2d at 875. We find that the district court's balancing of the probative value of the evidence of the shooting incident against its prejudicial harm was not an abuse of discretion. *See United States v. Rubio,* 727 F.2d 786, 798 (9th Cir.1983).

## C. BRADY ERROR

Prior to trial, Alene West ("Ms. West"), who was Felix Mitchell's attorney, met with him at his place of incarceration. At this meeting, Mitchell allegedly used West

to deliver a note to Brigham. The content of the note was said to threaten Brigham to keep him from testifying. At trial, the government had Brigham testify to this incident of "obstruction of justice" in an attempt to show Mitchell's desire to cover up criminal activity. Brigham's testimony on the incident was admitted against defendants Burton and Edmundson but the jury was instructed to disregard this "obstruction of justice" evidence with respect to Patterson and Grogans. The appellants tried to impeach Brigham in his testimony about the note by calling Ms. West to the stand to present her version of the incident. She, however, refused to testify, asserting her fifth amendment privilege.

Appellants contend this incident constituted *"Brady* error" in that the prosecution failed to give West use immunity for her testimony, which refusal resulted in a form of suppression of evidence favorable to the accused, contrary to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

 However this error is characterized, it seems clear *Brady* does not apply. *Brady* requires the prosecution, upon request, to disclose evidence which it has that is favorable to the accused. Here, the issue is not one of nondisclosure but whether the prosecution was required to immunize Ms. West to enable the appellants to contest Brigham's testimony.

 It is well established that a defendant has no absolute right to have a witness granted immunity.[5] *United States v. Mendia,* 731 F.2d 1412, 1414 (9th Cir.) *cert. denied,* 469 U.S. 1035, 105 S.Ct. 509,

---

4. Patterson's argument that the evidence which connected the shooting incident to the conspiracy and him to the shooting incident was weak goes to the sufficiency of the evidence. There is sufficient evidence if, reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Marabelles,* 724 F.2d 1374, 1377 (9th Cir.1984). Our review finds that the evidence of the shooting and Patterson's connection to it were sufficient.

5. The immunity statute, 18 U.S.C. § 6003, requires a district court, upon the request of the United States Attorney, to issue an order requiring a witness to give testimony he refuses to give on the basis of the privilege against self-incrimination when, in the United States Attorney's judgment, the testimony is "necessary to the public interest." Section 18 U.S.C. § 6002 protects the witness giving testimony under a section 6003 order by limiting the testimony to be used against the witness only in cases of criminal perjury, giving a false statement, or not complying with the order.

83 L.Ed.2d 399 (1984); *United States v. Lord,* 711 F.2d 887, 892 (9th Cir.1983). If it can be shown that the prosecution *intentionally* distorted the fact-finding process by causing a witness to invoke the fifth amendment privilege, then due process requires acquittal unless immunity is granted. *Lord,* 711 F.2d at 891. This is so that potentially exculpatory evidence will not be withheld from the jury thereby denying a fair trial. If a prima facie showing of prosecutorial misconduct by preventing a defense witness from giving relevant testimony is shown, acquittal is required unless the prosecution requests immunity for the witness at a new trial. *Id.* at 892–93.

█ Here, there was no prima facie showing the prosecution encouraged West to invoke her testimonial privilege. While appellants claim Ms. West invoked her privilege as a result of a promise by the prosecution not to prosecute her for "obstruction of justice," this claim is unsubstantiated. In fact, appellants admit West's counsel advised her to assert her privilege. (App. Brief at 87). Since there was no showing the prosecution created defense witness unavailability or that the fact-finding process was grossly distorted, we find no error in the failure to grant West immunity. *See United States v. Disla,* 805 F.2d 1340, 1353 (9th Cir.1986).[6]

**D. CODEFENDANT COUNSEL'S COMMENT**

In closing argument, Randy Patterson's counsel, Mr. Topel, made reference to the fact that his client testified while the other defendants did not. Mr. Topel's argument included the following statements:

Randy Brown [Patterson] is different than the other defendants in this case. He's different for one reason among many, but the one reason is that he has taken the stand and faced his accusers. He's allowed himself to be cross-examined. He has no obligation to do that in this country.

&ast; &ast; &ast; &ast; &ast; &ast;

The point that I am making is that when you gauge Randy Brown's [Patterson's] testimony and his courage in taking the stand, and any nervousness that you may have seen, you have to put him in the context in which he is testifying. He has no protection. He is totally exposed and he is at the mercy of you 12 people.

Edmundson, Burton, Grogans and Brown contend Mr. Topel's statements were an unconstitutional comment on their right to remain silent, requiring a new trial. *See Griffin v. California,* 380. U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

█ Comment on a defendant's failure to testify, whether by the prosecutor, the court, or a codefendant, is improper, *United States v. Moreno-Nunez,* 595 F.2d 1186, 1187 (9th Cir.1979), but only grounds for reversal if it appears that the comment may possibly have affected the verdict. *United States v. Pruitt,* 719 F.2d 975, 978 (9th Cir.) (per curiam), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 536, 78 L.Ed.2d 716 (1983).

█ While Mr. Topel's statements were improper, they did not cross the line of reversible error. The statements only indirectly referred to the defendants' failure to testify. They do not benefit Patterson at the expense of the other defendants. Nor do they stress any inference that the defendants were guilty because they chose to remain silent. *See United States v. Armstrong,* 654 F.2d 1328, 1336 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982); *cf. Moreno-Nunez,* 595 F.2d at 1187. Moreover, the district court admonished the jury with respect to Mr. Topel's statements that a particular defendant "does not get any added points by virtue of having taken the stand."

**E. JUROR EXCUSAL**

At the start of a new day during the trial, the district court informed defense counsel that a juror had been excused. The excusal was given as a hardship dispensation because of a death in the juror's

---

**6.** Brown argues that use immunity should also have been granted to Melvin Lester. We reject

that claim for the same reasons that the claim concerning West is rejected.

family. The dispensation was made without giving the defendants the opportunity to be heard on the excusal, and the excused juror was replaced with an alternate.

Billy Ray Brown individually argues it was error to excuse the juror outside his presence in that it deprived him of due process and the right to be present at every stage of the trial. Fed.R.Crim.P. 43(a).

 Failure to afford a defendant the opportunity to be heard prior to a juror being excused is not grounds for reversal without a showing of prejudice. *See United States v. Lustig*, 555 F.2d 737, 745–46 (9th Cir.1977), *cert. denied*, 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978) (quoting *United States v. Houlihan*, 332 F.2d 8, 13 (2d Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964)). A district court judge is presumed to not have made unfair remarks to a juror. *Id.* at 746. Even if the judge made unfair remarks to the juror, no prejudice could have resulted because the juror was excused and an alternate was substituted.

 Brown presents no showing of prejudice from the excusal. While it may have been preferable in retrospect to give Brown an opportunity to be heard during the excusal conference, the omission should not be considered reversible error given the expedition the circumstances required.

## F. EXPERT TESTIMONY

During trial, the government offered the testimony of Oakland Police Officer Gremminger. The testimony was offered as expert testimony on criminal narcotics distribution organizations and how they operate. His testimony was based on the activity he observed at San Antonio Village and hundreds of other narcotics investigations he had made. Billy Ray Brown argues Gremminger's testimony was not admissible as that of an expert since it was not based upon any scientific study or review of literature in the field but solely upon his observations as a police officer.

 The decision to admit expert testimony is committed to the discretion of the trial judge and is not disturbed on appeal unless manifestly erroneous. *Fleishman*, 684 F.2d at 1335. Expert testimony on the structure of criminal enterprises is allowed to help the jury understand the scheme and assess a defendant's involvement in it. *See United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir.1984) (expert testimony regarding general practice of criminals allowed to show *modus operandi*).

Brown does not allege Gremminger was not qualified as an expert witness. Rather, he argues there was no scientific link between Gremminger's observations and data relied on by experts in the field.

 We find this argument to be without merit. This government agent was uniquely situated to testify to general criminal practices to establish a *modus operandi*. The facts or data relied upon do not need to be admissible in evidence. Fed.R. Evid. 703. The testimony by Gremminger helped the jury to understand the complex heroin distribution scheme and was admissible for that purpose. *See Johnson*, 735 F.2d at 1202.

## G. PROSECUTORIAL MISCONDUCT

During a chance encounter at a laundromat between Assistant United States Attorney George Niespolo ("AUSA Niespolo") and Patterson, a brief conversation took place pertaining to the then pending trial. Patterson claims that AUSA Niespolo threatened him not to take the stand to testify on his own behalf or he was going to get the maximum sentence of twenty-five years. AUSA Niespolo admitted to having a conversation with Patterson, but denied that he threatened Patterson with twenty-five years if he testified. Rather, he contends that he explained to Patterson that if he were convicted, he would ask for the maximum sentence of twenty-five years.

Patterson moved to dismiss or for a mistrial for prosecutorial interference with his attorney-client relationship, invasion of his right to counsel, and for intimidating him from testifying. The government responded that there was neither misconduct nor

prejudice shown to justify dismissal or a mistrial.

"Whether substantial government interference with a defense witness occurred is a factual determination" to be reviewed under the clearly erroneous standard. *United States v. Little,* 753 F.2d 1420, 1439 (9th Cir.1985).

■■■ The district court ruled, during an evidentiary hearing on the matter, that there was prosecutorial misconduct. The court found it appalling that a prosecutor would conduct a conversation with a defendant whom he was prosecuting and held that anything more than a hello was wholly inappropriate. We agree. The government should not directly contact a defendant after an indictment has been filed, except in very limited situations. *United States v. Beasley,* 550 F.2d 261, 266 (5th Cir.), *cert. denied,* 434 U.S. 863, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977).

The issue then is whether this prosecutorial misconduct interfered with Patterson's attorney-client relationship, invaded his right to counsel, and/or intimidated him from testifying. The court held that it did not disbelieve AUSA Niespolo's version of the facts after having observed both him and Patterson testify. It found that although twenty-five years was mentioned, Patterson misunderstood the reference and that it did not come up in the context of what would happen if he testified. This *factual determination based on the credibility of the witnesses is not clearly erroneous.*

For the purpose of taking corrective action, however, the district court gave Patterson the benefit of the doubt and proceeded as though he had perceived that a threat had been made. Even so, the district court found that the conversation was not prejudicial nor did it deprive Patterson of his opportunity to take the stand on his own behalf. To counter the effect of any alleged threat, the court addressed Patter-

son personally and advised him that it was the court, not the prosecutor, who determined the sentence. The court also advised him that in sentencing it relied upon what was presented during the entire course of the proceedings, including the probation report, that his lawyer would be heard, and that most prosecution recommendations on sentencing were not followed by the court. Finally, the court ruled that if Patterson did take the stand, AUSA Niespolo could not cross-examine him nor would it allow any testimony by Patterson with respect to the conversation.

■■■ We agree with the district court's findings that no threat was actually made and therefore Patterson was not prejudiced by the conversation between himself and AUSA Niespolo. Even assuming there was prejudice, the district court's admirable handling of the situation through its corrective actions alleviated any potential for prejudice.[7] Further evidence of a lack of prejudice was the fact that Patterson did in fact testify on his own behalf. *See United States v. Coppola,* 788 F.2d 303, 307 (5th Cir.1986) (witnesses' subsequent conduct—agreeing to be interviewed—and the court's corrective actions—a curative notice—indicated no intimidation and no actual prejudice to defense).

## H. DANGEROUS SPECIAL DRUG OFFENDER SENTENCING

■■■ Appellate review of dangerous special drug offender ("DSDO") sentencing decisions made pursuant to 21 U.S.C. § 849 [8] (1981) (repealed Nov. 1, 1986) is broader than review of usual sentencing. *See United States v. Burt,* 802 F.2d 330 (9th Cir.1986) (reviewing a sentence imposed pursuant to a nearly identical statute, 18 U.S.C. §§ 3575–3576 (1985) (repealed Nov. 1, 1986)). Review of a DSDO sentence "shall include review of whether the procedure employed was lawful, the findings made were clearly erroneous, or the sen-

---

**7.** Since we agree that no threat was made, we need not reach the issue of whether the harmless error doctrine applies to the constitutional violations alleged.

**8.** "A defendant is dangerous ... if a period of confinement longer than that provided for such felonious violation is required for the protection of the public from further criminal conduct by the defendant." 21 U.S.C. § 849(f).

tencing court's discretion was abused." 21 U.S.C. § 849(h). To qualify as a DSDO, the district court must make two determinations. It must find by a preponderance of the evidence that the defendant was a special drug offender, 21 U.S.C. § 849(e), and dangerous, 21 U.S.C. § 849(f).

### 1. Randy Lamont Patterson—No. 85-1236

Patterson argues that the district court relied on two clearly erroneous findings in ruling that he was a special drug offender: (1) that all defendants were members of the conspiracy "through and including 1983" and (2) that all defendants continued "to deal with narcotics even after the indictment was handed down." Patterson contends those remarks were improperly applied to him because of the uncontroverted evidence that he voluntarily left the conspiracy in December, 1980.

Although these general remarks made by the trial judge at Patterson's sentencing were clearly incorrect, we find no error or abuse of discretion. The record is replete with instances which indicate the trial judge was fully aware that Patterson left the conspiracy in December, 1980. For instance, the district court judge instructed the jury that Patterson had voluntarily withdrawn from the conspiracy in 1980. Also, the trial judge mentioned during the sentencing proceeding that some defendants had left the conspiracy in 1980. It cannot be said, then, that this information was demonstrably made the basis for Patterson's sentence.

Patterson also alleges that the court failed to consider his rehabilitation in determining that he was dangerous. Although there is some evidence of rehabilitation (i.e., his recent marriage and his clean record since being placed on bail for his current offenses), the record is replete with instances of past wrongdoings (i.e., offenses since age 10, including assault, burglary, firearms and heroin dealing) that would support a finding of dangerousness. *See United States v. Scarborough*, 777 F.2d 175, 183 (4th Cir.1985) (frequency of crimes and their character could be suffi-

cient to find defendant dangerous under 18 U.S.C. § 3575). Furthermore, dangerousness need only be proved by a preponderance of the evidence. *See* 21 U.S.C. § 849(b). Under this lower standard of proof, the district court found that Patterson committed one of the Walker homicides, was involved in the murder of Vendetia Davis, shot Helen Campbell, and engaged in and directed other violent activities with members of the conspiracy. All support a finding of dangerousness.

### 2. Billy Ray Brown—No. 85-1240

Brown alleges that the district court relied on the same two clearly erroneous findings in ruling that he was a special drug offender and also failed to consider his rehabilitation when he was found to be dangerous. The trial court did, however, find by a preponderance of the evidence that Brown participated in the Walker homicide. It also found that Brown had an organizational role in the conspiracy. These findings were sufficient to establish that Brown was a special drug offender.

Brown does not have the past record of extensive violence exhibited by Patterson. He does, however, have a similar past record of other crimes. Dangerousness does not only mean that the defendant has a propensity to cause physical harm to others. *See United States v. Warme*, 572 F.2d 57, 62 (2d Cir.), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978) (examining 18 U.S.C. § 3575, a dangerous special offender statute worded nearly identically to 21 U.S.C. § 849). "A defendant may be found dangerous simply because the evidence shows he has no regard for the law and the rights of the public." *Id.* For the same reasons stated in the discussion of Patterson above, we find that the district court did not err in finding Brown subject to the DSDO sentencing provisions of § 849.

### 3. Marcus Wayne Edmundson—No. 85-1237

21 U.S.C. § 849(a) describes the notice requirements that a United States attorney

must follow whenever he is prosecuting a defendant as a DSDO "for an alleged felonious violation ... committed when the defendant was over the age of twenty-one years."

 The indictment charging the defendants, including Edmundson, with conspiracy to sell heroin alleged that the conspiracy began in January of 1976 and continued until February of 1983. Edmundson turned twenty-one in September of 1977. Nevertheless, we find that because the bulk of the charged conspiracy and many of the overt acts charged occurred after Edmundson turned twenty-one, the notice to the court by the United States Attorney specifying that Edmundson was believed to be a DSDO was not fatally defective for including activities that occurred prior to his twenty-first birthday.

 Edmundson argues that even if the notice were valid for those activities occurring after his twenty-first birthday, the district court relied on impermissible factors in determining that he was a dangerous special drug offender. The district court found that "... he participated in the Dorantes homicide." This homicide occurred one month prior to his twenty-first birthday. Even if it were error to consider Edmundson's participation in the homicide in determining whether he was a special drug offender, any error was harmless. Edmundson participated in numerous acts of force in connection with the conspiracy after he turned twenty-one.[9] It was not improper for the district court to consider the Dorantes homicide in determining that Edmundson was dangerous. Edmundson would have us read § 849(a)'s *notice* requirements as prohibiting the district court from considering any conduct that occurred prior to age twenty-one when determining whether a defendant is dangerous. 21 U.S.C. § 850, however, provides that *"no* limitation shall be placed on the information concerning the background, character, *and conduct"* which a court may receive and consider for purposes of imposing an appropriate sentence pursuant to DSDO sentencing. 21 U.S.C. § 850 (emphasis added). Section 850 merely codifies the principle that, in setting a sentence, a judge may consider a virtually unrestricted range of information. *United States v. Moccia,* 681 F.2d 61, 65 (1st Cir.1982). It was not improper for the district court to consider the Dorantes homicide in determining that Edmundson was dangerous.

Finally, Edmundson claims that his DSDO sentence should be reversed because the district court judge knew, prior to any verdict and before any consent to disclose was given, that the government had filed DSDO notices against the defendants in this case. Section 849(a) provides in relevant part:

> In no case shall the fact that the defendant is alleged to be a dangerous special drug offender be an issue upon the trial of such felonious violation, be disclosed to the jury, or be disclosed before any plea of guilty or nolo contendere or verdict or finding of guilty to the presiding judge *without the consent of the parties.*

21 U.S.C. § 849(a) (emphasis added).

It is clear from the record that the district court judge knew, prior to any verdict of guilty and before any consent to disclose was given, that DSDO notices had been filed against the defendants. A prior trial involving these same defendants, before District Court Judge William Orrick, ended in a mistrial. During this trial, the government filed DSDO notices as to all defendants except Edmundson, who was then a fugitive. These notices were dismissed as untimely by the then General Duty Judge Marilyn Hall Patel. Subsequently, Judge Patel was assigned to preside over the present case. Based on her prior knowledge of the DSDO notices, Judge Patel offered to recuse herself. The offer was not accepted. The government filed a second set of DSDO notices against all the defendants, including Edmundson. During a trial setting conference, defendant Mitch-

---

**9.** In determining that he was dangerous, the trial judge also found that Edmundson tried to protect Lester by hiding guns used in the Dorsey

murder, and that during the drug wars, he was involved in various shootings and attempts to torch cars and houses.

ell's lawyer disclosed to Judge Patel the existence of the second set of DSDO notices. The defendants later moved to dismiss the DSDO notices on various unrelated grounds. The government moved that the motion to dismiss be heard by the general duty judge rather than Judge Patel. The defendants objected and insisted that the motion be heard by Judge Patel. Edmundson then signed a consent form at the request of the government to allow pretrial disclosure to Judge Patel of the DSDO notice filed against him.

Section 849(a) does not specifically require that consent be made prior to disclosure. Because Edmundson consented to disclosure and because he failed to accept Judge Patel's offer to recuse herself, we will not now allow him to complain about prior disclosure.

The judgments of conviction as to all defendants are AFFIRMED.[10]

---

**10.** The separate appeal of Felix Mitchell was severed and separately briefed. No. 85–1169. Mitchell's appeal and the indictment were dismissed and his conviction was vacated on January 7, 1987, upon advice of counsel that Mitchell died in prison while the appeal was pending. *See United States v. Oberlin,* 718 F.2d 894, 895 (9th Cir.1983).