**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gaylord James MIGUEL,
Defendant–Appellant.**

**No. 90–10064.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 9, 1991.

Decided Dec. 20, 1991.

Javier Chon–Lopez, Asst. Federal Public Defender, Tucson, Ariz., for defendant-appellant.

James D. Whitney, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before CANBY and KOZINSKI, Circuit Judges, and NIELSEN,* District Judge.

PER CURIAM:

Gaylord James Miguel appeals his conviction for possession of marijuana with intent to distribute and conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1); 841(b)(1)(B)(vii) and 846. Appellant argues that the district court erred in denying his motions to suppress because federal agents lacked probable cause to arrest him and the *Miranda* warnings read to him did not adequately inform him of his right to appointed counsel.

### Facts

In the pre-dawn hours of April 23, 1989, electronic sensors monitored by the United States Border Patrol were activated along the Arizona/Mexico border. The sensors indicated that one or two vehicles were driving back and forth across the border in an area where there is no official border crossing station. Border Patrol agents Delores Pena and Isaac Kimzey responded by driving south on Indian Route 21 to investigate. A short time later Pena and Kimzey spotted a blue and white pickup truck with a camper shell towing a green and white pickup truck traveling north on Route 21. When the agents turned around to follow the trucks, the trucks stopped and four people jumped out and ran into the desert. After Pena discovered bundles of marijuana inside the blue pickup, she summoned agent James Gould, an expert tracker, to help pursue the suspects.

About an hour later, just after sunrise, Gould arrived and began following footprints left by the suspects. At one point, a single set of tracks diverged from the others and led Gould to codefendant Jose Albert Zepeda, who is Miguel's father.[1] Gould and other federal agents continued tracking the remaining three sets of prints to an area where two of the three split off. The trail led to two other suspects, codefendant Florentino Carrillo–Monteon and Miguel; the fourth suspect was never found. The officers found a loaded 9 mm pistol in the left back pocket of Miguel's pants.

Testimony at trial disclosed that early in the morning of April 23 Zepeda called Miguel, an auto mechanic, and asked him to drive to an area near the border to assist Zepeda, whose truck had broken down. A defense witness testified that Zepeda and his accomplices transferred marijuana from the disabled truck to Miguel's truck, but Miguel testified that he never saw the marijuana because it was dark and he was drunk and standing too far from the truck.

After his arrest, Miguel was taken to the Drug Enforcement Administration office in Tucson, where special agent Julius Anguiano of the U.S. Customs Service read Miguel his *Miranda* rights. Miguel waived his rights under *Miranda* and gave statements to Anguiano related to his activities with Zepeda on April 23. The post-arrest statements conflicted with Miguel's trial testimony and the prosecution used them to impeach Miguel's testimony.

### Discussion

### I. PROBABLE CAUSE

Miguel claims the agents lacked probable cause to arrest him because the

---

* The Honorable Wm. Fremming Nielsen, United States District Judge for the Eastern District of Washington, sitting by designation.

1. Zepeda and codefendant Florentino Carrillo–Monteon were tried separately.

tracking procedure they employed was unreliable. The district court, however, heard testimony and concluded that the agents had probable cause. Implicit in its conclusion is the finding that the tracks the agents followed led from the abandoned trucks to Miguel.

We have no basis for disturbing the district court's finding and conclude, therefore, that it did not err in denying appellant's suppression motion.

## II. THE MIRANDA WARNING

■ Miguel was given the following warning:

> You have the right to remain silent. Anything you say can be used against you in court, or other proceedings.
>
> You have the right to consult an attorney before making any statements, or answering any questions, and you may have him present with you during questioning.
>
> *You may have an attorney appointed* by the U.S. Magistrate or the Court to represent you, if you cannot afford or otherwise obtain one.
>
> If you decide to answer questions now, or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purposes of consulting a lawyer.
>
> However, you may waive the right to advice of counsel, and the right to remain silent, and answer questions or make the statement without consulting a lawyer if you so desire.

*Reporter's Transcript*, July 7, 1989, at 48–49 (emphasis added).

Miguel argues that use of the word "may" in the phrase, "You *may* have an attorney appointed by the U.S. Magistrate or the court to represent you, if you cannot afford or otherwise obtain one," rendered the warning inadequate because it improperly suggested that he might or might not get an attorney. In Miguel's view, the warning must advise him unequivocally that he is entitled to an attorney as of right.

Miguel relies principally on our holding in *United States v. Connell*, 869 F.2d 1349

(9th Cir.1989). At issue in *Connell* were two substantively different warnings, one oral and one written, administered simultaneously. *Id.* at 1350. Connell was given a standardized *Miranda* form and told to read his rights from the front of the form. That written warning stated:

> I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. However, I understand that I must make my own arrangements to obtain a lawyer and this will be at no expense to the Government. I further understand that if I cannot afford to pay for a lawyer and want one *arrangements will be made for me to obtain a lawyer in accordance with the law.*

*Id.* at 1350–51. While Connell read these words, the officer read him his *Miranda* rights from the back of the form:

> You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. However, you must make your own arrangements to obtain a lawyer and this will be at no expense to the Government. If you cannot afford to pay for a lawyer, one *may* be appointed to represent you.

*Id.* at 1350.

We determined that use of the word "may" in the oral warning left the impression that providing an attorney was discretionary, "particularly in light of the previous strong statement that 'you must make your own arrangements to obtain a lawyer and this will be at no expense to the government.'" *Id.* at 1353. Furthermore, we found the language in the written warning that "arrangements will be made ... in accordance with the law" ambiguous because Connell could not be expected to know what the requirements of the law might be. We also noted that combining the two different warnings added to the confusion that existed in the individual warnings.

*Connell* offered no opinion on whether the use of "may" in the oral warning was,

by itself, a sufficient basis for reversing the district court. As we noted in *Connell*, we had previously held that a warning complied with *Miranda* even though it failed to state explicitly that appointed counsel would be available prior to and during questioning. *Id.* at 1352. *See United States v. Noa*, 443 F.2d 144 (9th Cir.1971). We thus read *Connell* as holding that, because of the confusion engendered by the inconsistent warnings, the defendant could not readily infer the substance of his right to appointed counsel.

Our understanding of *Connell* is consistent with the Supreme Court's subsequent ruling in *Duckworth v. Eagan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 2879, 106 L.Ed.2d 166 (1989), where the Court held that it has "never insisted that *Miranda* warnings be given in the exact form described in [*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ]." *Duckworth* pointed out that the Court has held that " 'the "rigidity" of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant' and that 'no talismanic incantation [is] required to satisfy its strictures.' " *Id.* 492 U.S. at 202–203, 109 S.Ct. at 2879 (quoting *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981) (per curiam)). *Duckworth* involved two different warnings read to a suspect from printed forms within a span of 29 hours. *Id.* 492 U.S. at 197–199, 109 S.Ct. at 2876–2878. The challenged language appeared in the first warnings and stated that the suspect had the right to appointed counsel "if and when you go to court." A divided panel of the Seventh Circuit found the language defective because it denied the accused "a clear and unequivocal warning of the right to appointed counsel before any interrogation." *Eagan v. Duckworth*, 843 F.2d 1554, 1557 (7th Cir.1988). The Supreme Court reversed. In holding that the initial warnings satisfied *Miranda*, it reasoned that, because the warnings are merely a prophylactic method of safeguarding a suspect's fifth amendment right against self-incrimination, rather than reflecting an independent constitutional right, "[r]eviewing courts ... need not examine *Miranda*

warnings as if construing a will or defining the terms of an easement." 492 U.S. at 203, 109 S.Ct. at 2880. Instead of focusing on one sentence in isolation, the court looked to the warnings as a whole and found that they fully informed the suspect of his rights under *Miranda*. *Id.* at 205, 109 S.Ct. at 2881.

In light of *Duckworth*, we cannot say the warning given to Miguel was insufficient. In contrast to the two warnings administered in *Connell*, Miguel was given only a single warning. Agent Anguiano never made any statement to Miguel implying he had to make his own "arrangements" for an attorney or suggesting that the government would not pay for his attorney. Miguel was never charged with knowledge of the "requirements of the law." Miguel was explicitly advised that he had a right to consult with an attorney before answering questions or making any statements, that he was entitled to have the attorney present during questioning and that he could end police interrogation at any time by asking to speak to an attorney. It was in the context of these clear *Miranda* warnings that Miguel was told he "may" have an attorney appointed if he could not afford or otherwise obtain one. When we evaluate the totality of the warnings given, we believe that Miguel would be able to grasp the substance of what he was told—that he had the right to appointed counsel if he could not afford a lawyer. Accordingly, we affirm the district court's denial of the motion to suppress.

## III. SUFFICIENCY OF THE EVIDENCE

■ Appellant argues that the district court erred in denying his motion for judgment of acquittal. Few facts are actually in dispute; it really comes down to what Miguel knew about the marijuana operation. Miguel acknowledges that he went into the desert to help his father in the middle of the night, that he stood by while marijuana was loaded into his truck, and that he ran from the Border Patrol. He claims he knew nothing about the marijuana until he smelled it during the return trip. However, the jury was free to disbelieve Miguel's self-serving account of the events in question. There was sufficient

circumstantial evidence of Miguel's state of mind to find he was a knowing participant in the scheme.

## IV. EVIDENTIARY ERROR

 Appellant contends that the district court erred in allowing the prosecutor to ask Miguel's wife if she knew whether Miguel's father, codefendant Zepeda, recently had acquired a substantial sum of money.[2] Appellant argues that the question's probative value was outweighed by its prejudicial effect. Fed.R.Evid. 403. We have held that evidence of sudden or unexplained wealth is admissible in drug conspiracy trials if it creates a reasonable inference that the unexplained wealth came from the drug conspiracy. *United States v. Patterson*, 819 F.2d 1495, 1501 (9th Cir. 1987). Here, the question was intended to elicit evidence about whether Miguel knew that his father was getting rich dealing drugs when Miguel agreed to travel to the border, a pivotal issue in the trial. The district court did not abuse its discretion in admitting this evidence.

AFFIRMED.

---

2. Q: How often would you say that you and your husband see your father-in-law?

A: Every day.

Q: Now, you know, don't you, Renee, that in the last year or so your father-in-law has made an enormous amount of money?

*Reporter's Transcript*, October 18, 1989, at 32. After the court overruled defense counsel's objection, the witness answered, "I don't know." *Id.*