**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lexi Michelle BAUER, Defendant–**
**Appellant.**

---

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Calvin John TREIBER, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Cameron Scott BEST, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dawn MEEKS, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jodie Elleyn ISRAEL, a/k/a Jodie Treiber,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kelly WEGNER, Defendant, Jodie Elleyn**
**ISRAEL, a/k/a Jodie Treiber,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ernie MARTINEZ, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Pedro Pereda RAMIREZ, Defendant–**
**Appellant.**

**Nos. 94–30073 through 94–30076, 94–30084,**
**94–30094, 94–30171 and 94–30178.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 19, 1995 *.

Decided Feb. 2, 1996.

As Amended May 20, 1996.

* *United States v. Martinez*, No. 94–30171 and *Unit-* ed States v. Ramirez, No. 94–30178 were submit-

1550

ted without argument on July 19, 1995 pursuant to 9th Cir.R. 34–4 and Fed.R.App.P. 34(a).

Stephen T. Potts, Jardine, Stephenson, Blewett & Weaver, Great Falls, Montana, for defendant-appellant Bauer. David F. Ness, Missoula, Montana, for defendant-appellant Treiber. Donald B. Fiedler, Omaha, Nebraska, for defendant-appellant Best. Palmer Hoovestal, Helena, Montana, for defendant-appellant Meeks. Wendy Holton, Helena, Montana, for defendant-appellant Israel, a.k.a. Treiber.

James E. Seykora, Assistant United States Attorney, Billings, Montana, for the plaintiff-appellee.

Before: FARRIS, JOHN T. NOONAN, and HAWKINS, Circuit Judges.

Opinion by Judge FARRIS for Sections I and III–XV.

Opinion by Judge NOONAN for Section II.

Dissent by Judge NOONAN from Section I.

## OPINION

FARRIS, Circuit Judge:

Cameron Best, Calvin Treiber, Jodie Israel–Treiber, Dawn Meeks, Lexi Bauer, Ernie Martinez, and Pedro Ramirez appeal on various grounds their convictions of conspiracy to manufacture and distribute marijuana and distribution of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2; of the lesser included offense of simple possession in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i); and of various related charges.

We affirm in part and vacate and remand in part.

## FACTS

In 1991 Vern Williams informed the FBI that he was a trusted lieutenant in Cameron Best and Calvin Treiber's conspiracy to import, produce, and distribute marijuana in and around Billings, Montana. The government then initiated an investigation into this alleged conspiracy, code named "Reggae North." During the investigation, police apprehended a burglar who had illegally entered Best's home; he told police he had seen evidence of marijuana distribution in Best's residence. Police obtained a search warrant and discovered marijuana, L.S.D., a gun, and large amounts of U.S. Currency during the search. Searches of other locations uncovered additional marijuana, guns, and currency. When police searched Meeks' home, she was flushing marijuana down the toilet.

In exchange for leniency, several conspirators pled guilty and testified on behalf of the government. Their testimony revealed that Treiber and Best regularly received shipments of marijuana from Mexico, each weighing one to two hundred pounds; they had invested in the local growing operations of coconspirators; and they had used cash to make several large purchases, including a farm for $88,000 and several vehicles.

On November 20, 1992, a grand jury indicted twenty-six defendants in a 55 count indictment. Count I charged all defendants with conspiracy to manufacture and distribute marijuana, alleging 89 overt acts in furtherance of the conspiracy. Other counts included: money laundering, illegal use of telecommunications services, use of firearms in relation to drug trafficking, and possession with intent to distribute marijuana. The district court granted defendants' motion for severance and scheduled four separate trials. Treiber, Best, Bauer, Meeks and Israel–Treiber were all tried together.

Defendants moved to disqualify district court Judge Shanstrom based on public

statements he made about marijuana and marijuana distributors. The motion was heard and denied by senior district court Judge Battin.

The district court denied motions to dismiss for: 1) duplicity in the indictment, and 2) selective prosecution.

During voir dire, the government used peremptory challenges to strike four members of the venire, two of whom were Native Americans from the Fort Peck Reservation. Defendants challenged these strikes as racially discriminatory under *Batson*. The court held that: 1) defendants had made a prima facie case of discrimination, 2) the government had articulated a race-neutral reason, and 3) defendants did not meet their ultimate burden of proof on the issue of purposeful racial discrimination. It denied the *Batson* challenges.

The court refused to give two jury instructions requested by the defendants on the ground that the content of those instructions was adequately covered by the instructions proposed by the court. After the jury's guilty verdict, the court denied defendants' Rule 29 motions for acquittal claiming: duplicity of the indictment, selective prosecution, the right to a religious use defense, and misleading jury instructions.

## DISCUSSION

### I. PEREMPTORY CHALLENGES

The defendants challenge the prosecution's use of its peremptory challenges to strike from the jury two Native Americans from the Fort Peck Reservation. After the voir dire, counsel for Dawn Meeks moved to discharge the jury "on the grounds that the government had exercised discriminatory peremptory challenges" in striking Ms. Elvira Low Dog and Mr. Tony Martell. All other defendants then joined the defense motion to discharge the jury on *Batson* grounds.

■ The defendants had the burden of proving purposeful discrimination as established in *Batson v. Kentucky*, 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1722–24, 90 L.Ed.2d 69. They failed to do so.

■ The Supreme Court has outlined a three-step process for evaluating allegations that the prosecution used peremptory challenges in violation of the Equal Protection Clause.

Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem.,* —— U.S. ——, . ——, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995).

■ The district court held that the defendants satisfied step 1 by making a prima facie case of discrimination against Native Americans by striking Ms. Low Dog and Mr. Tony Martell. The burden of production then shifted to the prosecution to articulate a race-neutral explanation. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723–24. This burden "does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.'" *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771 (1995) (*citing Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866–67, 114 L.Ed.2d 395 (1991) (plurality opinion)).

■ The government explained that both Low Dog and Martell reside in the same geographical area as Arlie Shields, a government witness whose family had been threatened. It indicated that it feared these two potential jurors may be "anti-Arlie Shields" or anti-government based on where they live. The court was satisfied. It was not clear error to find that the government met its burden of production.

■ Defense counsel continued to argue discrimination, but offered no evidence to rebut the explanation of the prosecution. The court concluded that the defendants had not proven purposeful racial discrimination. This determination is not clearly erroneous. The correctness of the court's ruling must be

considered in terms of the information that was before the court at the time that the *Batson* objection was raised. The only question is whether the rejection of the defendants' *Batson* objection was clearly erroneous *in light of the information the district court had before it. United States v. Bishop,* 959 F.2d 820, 826 (9th Cir.1992) ("[T]he findings of the trial judge will not be set aside unless clearly erroneous.").

■ Peremptory challenges are based upon professional judgment and educated hunches rather than research. "In short, counsel is entitled to exercise his full professional judgment in pursuing his client's 'legitimate interest in using [peremptory] challenges ... to secure a fair and impartial jury.'" *Burks v. Borg,* 27 F.3d 1424, 1429 (9th Cir.1994). In *Burks,* we concluded that "[p]eremptory strikes are a legitimate means for counsel to act on such hunches and suspicions." *Id.* at n. 3. *See also J.E.B. v. Alabama ex rel. T.B.,* — U.S. —, —, 114 S.Ct. 1419, 1431, 128 L.Ed.2d 89 (1994) (O'Connor, J. concurring) ("[A] trial lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and educated guesses.... That a trial lawyer's instinctive assessment of a juror's predisposition cannot meet the high standards of a challenge for cause does not mean that the lawyer's instinct is erroneous.")

The Supreme Court, recognizing "the contribution the [peremptory] challenge generally makes to the administration of justice," has placed the burden of proof on the opponent of the peremptory strike. *Batson,* 476 U.S. at 98–99, 106 S.Ct. at 1723–24. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett,* — U.S. at —, 115 S.Ct. at 1771.

■ Following the government's race-neutral explanation, defense counsel supported its opposition of the strike by stating:

Mr. Fiedler: Your Honor, Batson does state that a prosecutor cannot challenge potential jurors on the assumption that, for instance, in the Batson case it was a Black juror, as a group would be unable to consider the state's case against the defendant impartially.

Well, the preoffer [sic] that was made by Mr. Seykora went to both groups, the church and to the members of the Crow Nation. That was because of the fact of Arlie Shields that they wouldn't be able to listen to the case impartially.... but as Mr. Seykora pointed out, there were questions asked to the jurors and they didn't raise their hands. So he had no basis as individuals to think that the taint from the group would attach to the individual jurors.

Tr. at 204. The court rejected the defendants' objections. Its determination that purposeful racial discrimination had not occurred is entitled to great deference. It should be reversed only if clearly erroneous. *Bishop,* 959 F.2d at 826; *Hernandez,* 500 U.S. at 364, 111 S.Ct. at 1868–69. "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. As the Supreme Court made clear in *Hernandez,* "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez,* 500 U.S. at 365, 111 S.Ct. at 1869 (citation omitted). *See also Bishop,* 959 F.2d at 826 (noting "the 'great deference' to which the trial court's factual findings regarding purposeful discrimination in the jury selection are entitled.").

The dissent echoes defense counsel's argument that the racial nature of the prosecutor's explanation would lead to every single Native American Indian being stricken as a juror. We disagree. The race-neutral explanation articulated by the prosecutor for striking the two jurors was based on where they live, not their racial background. The fact, later determined, that the geographical area is approximately half Caucasian was not before the court at the time of its ruling. We refuse to speculate on what the court may or may not have done, had that fact been brought to its attention. "[T]he ultimate burden of persuasion regarding racial

motivation rests with, and never shifts from the opponent of the strike." *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771. The district court's determination is not clearly erroneous.

NOONAN, Circuit Judge.

## II. RELIGIOUS USE DEFENSE UNDER THE RELIGIOUS FREEDOM RESTORATION ACT

Calvin Treiber, Dawn Meeks, and Lexi Bauer have presented themselves as Rastafarians. We focus here on an issue of first impression: the interaction of the Religious Freedom Restoration Act of 1993 with the claim of use by Rastafarians of marijuana for religious purposes.

Treiber, Meeks, and Bauer asserted that they are Rastafarians and were Rastafarian at the time of the charged offenses, and that Rastafarianism is a recognized religion. It is a religion which first took root in Jamaica in the nineteenth century and has since gained adherents in the United States. *See* MIRCEA ELIADE, ENCYCLOPEDIA OF RELIGION 96–97 (1989). It is among the 1,558 religious groups sufficiently stable and distinctive to be identified as one of the existing religions in this country. *See* J. GORDON MELTON, ENCYCLOPEDIA OF AMERICAN RELIGIONS 870–71 (1991). Standard descriptions of the religion emphasize the use of marijuana in cultic ceremonies designed to bring the believer closer to the divinity and to enhance unity among believers. Functionally, marijuana—known as ganja in the language of the religion—operates as a sacrament with the power to raise the partakers above the mundane and to enhance their spiritual unity.

### A. Proceedings

The religious issue was first raised in June 1993 by Meeks who sought funds under 18 U.S.C. § 3006A(e)(1), which provides that counsel for a person financially unable to obtain expert services necessary for adequate representation may request the funds in an ex parte application. Counsel for Meeks sought money to pay for a physician to testify as an expert on her medical needs and a theologian to testify as an expert on her use of marijuana for both religious and medicinal reasons. The motion was denied by the district court.

On September 24, 1993, the district court granted the government's motion in limine to preclude the appellants from presenting testimony or evidence on their possession or use of marijuana for religious purposes as a legal defense. The district court granted the motion "upon review of the pleadings." The district court relied on *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

On September 27, 1993, the district court granted Lexi Bauer's motion to adopt all pretrial motions by her codefendants and Dawn Meeks's motion "to join all other motions." Subsequently, the district court granted Lexi Bauer's motion to join all other defense motions.

The trial began on October 3, 1993. Meanwhile the Religious Freedom Restoration Act was proceeding through Congress. It had been introduced with one hundred twenty cosponsors and was passed by the House on May 11, 1993. It was passed by the Senate with amendments on October 27, 1993. On November 3, 1993, the House and Senate agreed to amendments, and the bill was sent to President Clinton, who signed it into law on November 16, 1993.

On November 17, 1993, the defendants drew the district court's attention to the report of the President's signing of the bill and, while professing not to know whether it was retroactive, renewed their objection to the court's in limine ruling. Counsel for Treiber moved to reverse the court's order "with regard to the First Amendment defense." Counsel for Meeks joined in Treiber's motion. Bauer was already recognized as joining all relevant defense motions. The court did not change its position. Meeks also requested the district court to instruct the jury to use the balancing test of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), in accordance with the Religious Freedom Restoration Act. The district court refused to grant the request.

After the trial, Treiber moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure because of the court's exclusion of evidence of the religious purposes of the defendants' possessing or using marijuana. Defendants filed motions to join, but on January 27, 1994, the Government filed a notice that it would not respond further to the motions to join, apparently relying on the court's prior order that all defendants were deemed to have joined in motions by their codefendants. In ruling on the Rule 29 motion, the district court analyzed and applied the Religious Freedom Restoration Act.

The district court first found that the challenged law substantially burdened the free exercise of the Rastafarian religion. Relying on several earlier appellate cases, the district court held, however, "that the government has an overriding interest in regulating marijuana." The district court quoted *Leary v. United States,* 383 F.2d 851, 861 (5th Cir. 1967), *rev'd on other grounds,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), as follows: " 'It would be difficult to imagine the harm which would result if the criminal statutes against marihuana were nullified as to those who claim the right to possess and traffic in this drug for religious purposes. For all practical purposes the anti-marihuana laws would be meaningless, and enforcement impossible.' " The district court concluded that the government's in limine motion would have been granted even if the Religious Freedom Restoration Act had been the law of the land at the time.

Bauer, Meeks and Treiber appeal the district court's rulings as to the religious use of marijuana.

**B. The Statute**

The statute is new and so far has not been construed by any appellate court in a case involving the religious use of marijuana. We have applied the new law in a case where a school district's "no knives" policy and Cal.Penal Code § 626.10(a) led the school district to prohibit Sikh children from wearing seven-inch kirpans (small swords) to school, as their faith required. Reversing the district court, which had "misapprehended the law," we directed the court to protect the safety of the students and accommodate the religious requirements of the Cheema children. *See Cheema v. Thompson,* 67 F.3d 883, 887 (9th Cir.1995) (Wiggins, J., dissenting) (quoting unpublished disposition). The ordinary canons of legislative interpretation require us to give attention to each of the provisions of the new statute in the context of federal criminal law on marijuana.

To begin with, Congress found that "the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution"; that laws which are neutral toward religion "may burden religious exercise as surely as laws intended to interfere with religious exercise"; that "governments should not substantially burden religious exercise without compelling justification"; and that in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a).

Congress then declared that the purposes of the Act were:

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1987) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

§ 2000bb(b). In the light of these findings and purposes, Congress provided as follows:

**§ 2000bb–1. Free exercise of religion protected**

**(a) In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

### (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

### (c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

Congress also provided definitions, which read as follows:

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State;

(2) the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4) the term "exercise of religion" means the exercise of religion under the First Amendment to the Constitution.

§ 2000bb–2.

We note the following specific features of the legislation: *First.* While implicitly criticizing *Smith,* the statute does not present itself as an interpretation of the Constitution overruling *Smith;* rather it consists of a command that must be followed as a matter of federal law. The command results in setting aside a common rationale for applying a statute to burden religious exercise, the rationale that the statute has "general applicability" and was not intended to discriminate against, or otherwise inhibit, a religious practice. *Second.* The statute goes beyond the constitutional language that forbids the "pro-hibiting" of the free exercise of religion and uses the broader verb "burden": a government may burden religion only on the terms set out by the new statute. *Third.* There is an unusual statutory incorporation of two decisions of the Supreme Court, to which Congress refers as guides to the purposes of the statute. *Fourth.* There is one explicit reference to the Constitution in that what is meant by the exercise of religion is to be determined in terms of the First Amendment to the Constitution. *Fifth.* If there is a substantial burdening of a person's exercise of religion, the government must meet two tests. The government must "demonstrate" that the application of the burden to this particular person furthers "a compelling governmental interest." The government must "demonstrate" that this application "is the least restrictive means of furthering that compelling governmental interest." *Sixth.* What is meant by "demonstrate" is explicitly defined in terms of the government's burdens "of going forward with the evidence and of persuasion." *Seventh.* The statute explicitly includes the United States and its officers among those who must meet the two burdens imposed.

The effects of the Religious Freedom Restoration Act are widespread. The Act "legislatively overturned a number of recent Supreme Court decisions ... by defining a statutory (if not a constitutional) right to the free exercise of religion." *Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir.1995) (holding that the standards set by *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), no longer apply in determining a state prisoner's right to the free exercise of his religion in prison); *see also Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995) (applying the Act but finding no substantial burden on the prisoner's exercise of his religion).

The power of Congress to provide federal protection in addition to that accorded by the great guarantees of the Bill of Rights has been exerted in other contexts. *E.g.,* the Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa–2000aa–12 (restricting government investigators seeking documents from

the media and limiting the effect of *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)); the Church Audit Procedure Act of 1984, 26 U.S.C. § 7611 (strictly regulating "church tax inquiry" and "church tax examination" by the Internal Revenue Service); and the Exemption Act of 1988, 26 U.S.C. § 3127 (providing a special Social Security tax exemption for employers and their employees who are members of "a recognized religious sect" whose "established tenets" oppose participation in the Social Security Act program). The last exemption freed the Old Order Amish from the impact of *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), which declined to recognize the Amish free exercise of religion claim on the ground that national compulsory uniformity was essential in the collection of the tax.

### C. The Application of the Statute in This Case

█ The district court treated the existence of the marijuana laws as dispositive of the question whether the government had chosen the least restrictive means of preventing the sale and distribution of marijuana. The district court relied on a drug case decided before the enactment of the Religious Freedom Restoration Act. We do not exclude the possibility that the government may show that the least restrictive means of preventing the sale and distribution of marijuana is the universal enforcement of the marijuana laws. Under RFRA, however, the government had the obligation, first, to show that the application of the marijuana laws to the defendants was in furtherance of a compelling governmental interest and, second, to show that the application of these laws to these defendants was the least restrictive means of furthering that compelling governmental interest. The Act was relevant to the counts of simple possession.

█ As to the counts relating to conspiracy to distribute, possession with intent to distribute, and money laundering, the religious freedom of the defendants was not invaded. Nothing before us suggests that Rastafarianism would require this conduct. These counts stand. As to the three counts on which the appellants were convicted of simple possession, the exclusion of the religious defense was in error.

Treiber, Meeks and Bauer may be retried on the possession counts. The government should be free to cross-examine them on whether they, in fact, are Rastafarians and to introduce evidence negating their asserted claims. It is not enough in order to enjoy the protections of the Religious Freedom Restoration Act to claim the name of a religion as a protective cloak. Neither the government nor the court has to accept the defendants' mere say-so. The court may conduct a preliminary hearing in which the defendants will have the obligation of showing that they are in fact Rastafarians and that the use of marijuana is a part of the religious practice of Rastafarians.

FARRIS, Circuit Judge.

### III. EXTRAORDINARY FUNDS FOR THEOLOGY EXPERT

█ Meeks appeals the denial of her request for extraordinary funds to retain a theology expert. Meeks' representation was publicly funded under the Criminal Justice Act, 18 U.S.C. § 3006A. This Act provides Counsel for persons who are financially unable to obtain expert services necessary for adequate representation. § 3006A(e). The district court is only required to authorize defense services for an indigent defendant "in circumstances in which a reasonable attorney would engage such services for a client having the independent financial means to pay for them." *United States v. Sims,* 617 F.2d 1371, 1375 (9th Cir.1980) (*quoting United States v. Bass,* 477 F.2d 723, 725 (9th Cir.1973)). On remand, Meeks will have to demonstrate that she is, in fact, a Rastafarian. The district court will have to determine, in light of our holding, whether a reasonable attorney would engage the services of a theology expert for Meeks if she had the independent financial means to pay for them.

### IV. MOTION TO DISQUALIFY JUDGE SHANSTROM

█ Treiber, Israel–Treiber, Bauer and Meeks filed a motion to have Judge

Shanstrom disqualified based on statements attributed to him in three articles published in the *Billings Gazette*. Judge Shanstrom referred the motion to Senior Judge Battin who properly denied it.

The denial of a motion to disqualify or recuse a judge is reviewed for abuse of discretion. *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir.1993). Judge Shanstrom's statements indicate a view that marijuana distribution is a serious and pervasive social problem. "A judge's views on legal issues may not serve as the basis for motions to disqualify." *United States v. Conforte*, 624 F.2d 869, 882 (9th Cir.1980). To disqualify a judge, only the alleged bias must amount to "animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct." *Id.* at 881.

## V. SELECTIVE PROSECUTION

■■■■■ Best, Treiber, Meeks, Israel–Treiber, and Bauer all contend that the district court erred in denying their motions to dismiss the indictment on the ground of selective prosecution. A ruling on selective prosecution is reviewed for clear error. *United States v. Gutierrez*, 990 F.2d 472, 475 (9th Cir.1993). A prosecutor's decision to bring charges is beyond judicial review unless the defendants can make a *prima facie* showing that the decision rested on an impermissible basis. *United States v. Davis*, 36 F.3d 1424, 1432 (9th Cir.1994). To do this, a defendant must show that: 1) others similarly situated were not prosecuted, *and* 2) the prosecution of the defendant was based on an impermissible motive. *Id.* After an evidentiary hearing, the district court ruled that the decision to prosecute had been based not on prejudice, but on information derived from informants and the government's own investigation. This holding was not clearly erroneous.

## VI. DUPLICITY OF THE INDICTMENT

■■■■■ The appellants argue that Count I of the indictment was duplicitous because it charged multiple conspiracies as a single conspiracy. We review the sufficiency of an indictment, *de novo*. *United States v. Dischner*, 974 F.2d 1502, 1518 (9th Cir.1992).

■■■■■ An indictment is not duplicitous merely because it charges a conspiracy to commit more than one offense. *United States v. Begay*, 42 F.3d 486, 501 (9th Cir. 1994). "The question whether a single conspiracy, rather than multiple conspiracies, has been proved is a question of sufficiency of the evidence." *Id.* A single conspiracy can include subgroups or subagreements and the evidence does not have to exclude every hypothesis other than that of a single conspiracy. *United States v. Patterson*, 819 F.2d 1495, 1502 (9th Cir.1987). "A single conspiracy exists, as compared with multiple conspiracies, where there is 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *Id.* (citations omitted). A reasonable jury could properly find the conspiracy as charged in Count I of the indictment.

## VII. MISLEADING JURY INSTRUCTIONS

The defendants also argue that the jury instructions were misleading because they instructed the jury that "a separate crime is charged in each count" and did not instruct the jury to acquit if it found that "a series of separate conspiracies existed rather than the single conspiracy charged Count I," as they requested. They contend that the combination of these instructional errors deprived them of their key defense: that the government lumped several separate buyer-seller transactions into one conspiracy.

■■■■■ We review the jury instructions as a whole, *United States v. Joetzki*, 952 F.2d 1090, 1095 (9th Cir.1991), and accord the trial judge substantial latitude so long as the instructions fairly and adequately covered the issues presented. *United States v. Powell*, 955 F.2d 1206, 1210 (9th Cir.1991).

■■■■■ The district court instructed the jury that "a single conspiracy exists, as compared with multiple conspiracies, where there is an overall agreement to perform various functions to achieve the objectives of the conspiracy." It further instructed the jury that it

must return a verdict of not guilty for any defendant unless the evidence showed beyond a reasonable doubt that the defendant "knew the purpose of the [conspiracy] and deliberately entered into the agreement intending ... to accomplish [its] goal or purpose." The district court also gave the Ninth Circuit Model Instruction on "multiple conspiracies" which reads in pertinent part:

> If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though the defendant may have been a member of some other conspiracy.

The instructions, taken as a whole, adequately covered the multiple conspiracy defense.

## VIII. CALCULATION OF BASE OFFENSE LEVELS

 Treiber, Meeks, and Israel–Treiber each challenge the district court's calculation of their base offense levels.[1] They argue that they were sentenced for quantities of drugs not reasonably foreseeable to them. Whether conduct in furtherance of a conspiracy was reasonably foreseeable is a factual finding reviewed for clear error. *United States v. Torres–Rodriguez,* 930 F.2d 1375, 1389 (9th Cir.1991). In *United States v. Diaz Rosas,* 13 F.3d 1305, 1308 (9th Cir.1994), we held that:

> A defendant who is guilty of conspiracy to possess and distribute cocaine may properly be held accountable for any cocaine possessed or distributed by coconspirators, so long as that cocaine was foreseeable to him. It is not necessary that the defendant personally possessed all of the cocaine for which he is held accountable.

*Citing* U.S.S.G. § 1B1.3; *U.S. v. Conkins,* 987 F.2d 564 (9th Cir.1993). The same is true for conspiracies involving marijuana. The record establishes that the district court did not err in its calculation of the base offense levels.

## IX. MOTIONS TO SUPPRESS EVIDENCE

 Treiber[2], Best, and Israel–Treiber each argue that the district court erred when it denied their separate motions to suppress evidence found in three separate searches. We review *de novo* the district court's determinations on motions to suppress but we review factual findings for clear error. *United States v. Becker,* 23 F.3d 1537, 1539 (9th Cir.1994).

### A. Treiber

 Treiber and Bauer challenge the district court's finding of probable cause, which was based on an affidavit, to search the residence of Treiber's brother Todd. The affidavit did not contain the prior criminal record of the source of the information supporting probable cause. The affidavit in support of the warrant did contain extensive detail concerning the operation and the likely quantity and location of marijuana stored at Todd Treiber's residence, as well as that expected to be found at other locations contained in the affidavit. The district court did not err in denying the motion to suppress.

### B. Best

 The affidavit in support of the search warrant for Best's residence was based in part on a statement by Edgar Franz who was apprehended shortly after burglarizing Best's home. The district court found that the affidavit did not contain false statements. This finding of fact was not clearly erroneous. The affidavit supported a finding of probable cause.

### C. Israel–Treiber

 Israel–Treiber argues that the police illegally seized marijuana after a warrantless search of her purse in violation of the Fourth Amendment. The purse was opened by a nurse, after Israel–Treiber's consent, in an attempt to verify her true name from her driver's license. The officer smelled and saw

---

1. Bauer does not raise this argument in her opening brief, but adopts all arguments made by her co-appellants by reference in her reply brief.

2. Bauer joins in Treiber's argument.

the marijuana when the nurse opened the purse. The district court denied her motion to suppress on the ground that she had "in effect put the incriminating evidence within the plain view of" the police officer. It held the search to be a private search not in violation of Israel–Treiber's Fourth Amendment rights. *See United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The district court's factual finding that the marijuana was in plain view was not clearly erroneous.

## X. MOTIONS FOR MISTRIAL

■ Best, Treiber, Bauer, and Israel–Treiber appeal the district court's denial of defense motions for a mistrial. One motion was based on the admission of testimony of Luke Mills. The other was based on a stricken comment from Captain O'Brien made on redirect examination. Denial of a motion for mistrial is reviewed for abuse of discretion. *United States v. Homick,* 964 F.2d 899, 906 (9th Cir.1992). The record reflects no basis for mistrial. There was no abuse of discretion.

## XI. SUFFICIENCY OF THE EVIDENCE

■ Bauer and Israel–Treiber argue that their money laundering convictions should be reversed due to insufficient evidence presented by the government at trial. These conviction will be upheld "if the evidence, when viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The test was met.

## XII. DISCRETIONARY REFUSAL TO DEPART FROM THE GUIDELINES

■ Bauer appeals the district court's refusal to grant a downward departure for acceptance of responsibility. The district court exercised its discretion not to depart downward based on its finding that at no time during the course of the trial had Bauer ever accepted responsibility. A district court's discretionary refusal to depart from the Sentencing Guidelines is not reviewable on appeal. *United States v. Eaton,* 31 F.3d 789, 792 (9th Cir.1994).

## XIII. MOTION FOR CONTINUANCE

■ Best contends that he was deprived effective assistance of counsel when the district court denied his request for a continuance so that his attorney could adequately prepare. The decision to deny a motion for continuance is reviewed for an abuse of discretion. *United States v. Gonzalez–Rincon,* 36 F.3d 859, 865 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995). "To reverse a trial court's denial of a continuance, an appellant must show that the denial prejudiced her defense." *Id.*

■ Best's attorney, Donald Fiedler, was appointed to represent Best on May 13, 1993 after the court found Best indigent. Fiedler admitted to having already spent "months trying to become familiar with case, working on the detention hearing, working with Cameron [Best] and working with his family." Best requested a continuance from the original June 21, 1993 trial date to a November 1993 trial date. Fiedler did not appear at the hearing to set a new trial date, and the court set the date for September 20, 1993. The district court did not abuse its discretion in denying Best's motion for continuance. Best has not shown actual prejudice resulting from the denial. *See United States v. Tham,* 960 F.2d 1391, 1396 (9th Cir.1991).

## XIV. MARTINEZ

Martinez argues that the district court denied him effective assistance of counsel by refusing to grant him extra time at the May 12, 1994 hearing. He was not denied effective assistance of counsel.

Martinez entered a guilty plea, along with three codefendants, on March 22, 1994. He agreed to a sentence of 78 months. Within sixty days of entering the plea, the three codefendants filed motions to withdraw their pleas. Martinez never filed a motion to withdraw his plea. During the sentencing hear-

ing on May 12, 1994, counsel for Martinez requested additional time to confer with Martinez. The court denied the request, noting that Martinez had not filed any of the motions under consideration. It also denied the codefendants' motions to withdraw. Martinez was sentenced to the agreed 78 months.

■ The issue of effective assistance of counsel "is more appropriately addressed in a habeas corpus proceeding because it requires an evidentiary inquiry beyond the official record." *United States v. Carr,* 18 F.3d 738, 741 (9th Cir.1994). However, the claim can be resolved "on direct appeal when the record is sufficiently developed to permit the reviewing court to resolve the issue." *United States v. Daly,* 974 F.2d 1215, 1218 (9th Cir.1992). The record is sufficiently developed to show that counsel for Martinez did not fall below the objective standard of reasonableness required by *Strickland v. Washington,* 466 U.S. 668, 690–92, 104 S.Ct. 2052, 2065–67, 80 L.Ed.2d 674 (1984). He asked the judge for time to confer with Martinez and was denied. It was too late to join the motions to withdraw.

Further, Martinez was not prejudiced by his counsel's failure to join the motions. The motions were denied and we affirmed the denial. *United States v. Best,* Nos. 94–30172, 94–30175, 94–30176, 1995 WL 218502 (Filed April 13, 1995).

■ Martinez failed to challenge the amount of marijuana attributed to him in the presentence report at the district court. He has waived his right to challenge that amount on appeal. *United States v. Visman,* 919 F.2d 1390, 1393 (9th Cir.1990).

## XV. RAMIREZ

Ramirez agreed to an offense level of 31 as part of his plea, giving him a sentencing range of 108 to 135 months. He now challenges his sentence of 120 months, arguing that the amount of marijuana attributed to him in the presentence report was not supported by the facts. He failed to challenge the presentence report in the district court and agreed to the sentence in his plea. We reject his challenge. *Visman,* 919 F.2d at 1393.

Affirmed in part. Vacated and remanded in part. The convictions of Bauer, Meeks and Treiber on Counts 15 and 54 and of Meeks on Count 13 are **VACATED** and the case on those counts is **REMANDED** to the district court.

NOONAN, Circuit Judge, Dissenting from part I:

A key issue on this appeal is the prosecution's disqualification of two Native American Indians from the Fort Peck Reservation. Judge Shanstrom conducted the voir dire, reading off the names of a witness list that consisted of approximately 150 witnesses. The court asked the potential jurors to raise their hands if they knew any of the witnesses. Several potential jurors said they had personal knowledge of particular witnesses (sixteen such witnesses in all), and the court dismissed two of those potential jurors for cause. Among the witnesses whose names were called was Arlie Shields, a Native American Indian from Wolf Point, a town within the Fort Peck reservation occupied by both Caucasians and members of various Indian tribes. No juror indicated knowledge of Arlie Shields. At the conclusion of the voir dire, fifteen jurors were sworn. The prosecutor questioned jurors about their knowledge of government witnesses but asked them nothing as to their knowledge of Arlie Shields.

Counsel for Dawn Meeks moved to discharge the jury "on the grounds that the government had exercised discriminatory peremptory challenges." Counsel noted: "juror Number 25 is Ms. Elvira Low Dog. She is Crow Indian or either Assiniboin, Sioux or Crow Indian. I think she was from Wolf Point, as well as Tony Martell. Tony Martell appeared to be Crow as well. All of these jurors, your honor, of color, were discharged by the government.... The only reasonable conclusion that you can draw from the fact that they knocked off these jurors is that they discriminated against them on the basis of race. We had some people of color and now we have basically an all white jury." All other defendants then joined the defense motion to discharge the jury on *Batson* grounds. The government

responded that the defendants had failed to make the required prima facie case of racial discrimination. The court ruled: "I think they have, and I'm going to ask you to respond to it."

In response, the government said in reference to Elvira Low Dog:

We didn't really learn too much about her. One of the witnesses that the government has in this particular case is Arlie Shields. Arlie Shields has been having, within the confines of even being incarcerated at the present time, is a member of the Fort Peck Tribe up there [sic]. It is very difficult to discern that—his family has been threatened. We do not—without getting into sounding like a racial type question to individual members of the Tribe, as I recall both of them are located in the Fort Peck area. We have had numerous people that we have prosecuted in that area. We have tried to flesh out some of these questions, asking, and the court asked, whether any relatives had been charged and so on. I don't have any direct information about any of the relatives being charged. But, very frankly, the government was not willing to take the risk of perhaps being anti-Arlie Shields, who is a witness in this particular case or anti-government. There are several tribal members that have been prosecuted before this court up there, judge. It had nothing to do with color whatsoever.

The defense then asked what the government proffer was as to Tony Martell. The government responded: "Martell, I believe in her questionnaire is a member of—is living in the Wolf Point area or Poplar Area as I recall."

Defense counsel replied that the government "admits that they exercised racial discrimination in exercising these peremptory challenges because of the fact that these particular individuals happened to be Indian." Under the government's rationale, counsel added, "every single Native American Indian must be stricken as a juror. He admits to it, your honor." Defense counsel further argued that the government could not "challenge potential jurors on the assumption that, for instance, in the *Batson*

case, it was a Black juror, as a group would have been unable to consider the state's case against the defendant impartially. Well, the proffer that was made by Mr. Seykora went to . . . the members of the Crow Nation. That was because of the fact of Arlie Shields that they would not be able to listen to the case impartially. . . . but as Mr. Seykora pointed out, there were questions asked to the jurors and they didn't raise their hands. So he had no basis as individuals to think that the taint from the group would attach to the individual jurors." The court responded: "The motion is denied."

In *Batson* the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1722–24, 90 L.Ed.2d 69 (1986). First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id.* at 96–97, 106 S.Ct. at 1722–23. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97–98, 106 S.Ct. at 1723–24. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1723–24. In *Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1990), the Supreme Court reasserted the three-part analysis first enunciated in *Batson,* noting that the analysis "permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Id.* at 358, 111 S.Ct. at 1866. "This three-step inquiry," the Court wrote, "delimits our consideration of the arguments raised by" the party challenging peremptory strikes under *Batson. Id.* at 359, 111 S.Ct. at 1866–67. In its most recent treatment of *Batson,* the Court reaffirmed that courts facing Equal Protection challenges to the use of peremptories must follow the three-step inquiry set out in *Batson. Purkett v. Elem,* — U.S. —, —— ——, 115 S.Ct. 1769, 1770–1771, 131 L.Ed.2d 834 (1995).

In our case, the defendants satisfied the first step by making out a prima facie case of discrimination against Native American Indians, and the court so ruled. The government attempted to satisfy the second step with the "race-neutral explanation" that Elvira Low Dog was from the Fort Peck area, as was one government witness, Arlie Shields, also an American Indian. The government expressed concern, therefore, that there was "the risk" of "perhaps being anti-Arlie Shields" or being "anti-government" because "several tribal members have been prosecuted." As to Tony Martell, the government's explanation was not fleshed out. The government said he lived in "the Wolf Point area or Poplar Area." The significance of Martell's living in the Poplar Area was not explained at all. Apparently the government assumed that the court would know that the headquarters of the Fort Peck Reservation were located in Poplar, and hoped that the court would infer that the explanation for eliminating Elvira Low Dog applied to Tony Martell as well. If these were race-neutral explanations, the court was then obliged to determine whether the defendants had proved purposeful racial discrimination.

On their face, these explanations were arguably race-neutral. To pass step two, the explanations need not be "persuasive or even plausible." *Purkett v. Elem,* —— U.S. at ——, 115 S.Ct. at 1771. In accepting the explanations as race-neutral, the district court does not implicitly find a lack of discriminatory intent. The court's determination occurs only at step three when it decides whether the race-neutral explanations offered are both plausible and persuasive. In this third step, "the persuasiveness of the justification becomes relevant." *Id.* The burden of proof remains that of the objector to the peremptory. *Id.* But the objector may turn the apparently-neutral response to his advantage by showing that it is flimsy. "At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.*

The correctness of the court's ruling must be determined in terms of the information that was before the court at the time that the *Batson* objection was raised. The total area of the Fort Peck Reservation is 964,864 acres, of which 233,153 acres are tribal land, 645,114 acres are allotted land, and the rest is owned by the United States. Approximately half the reservation population is Sioux, one-third is Assiniboin, and the remainder is described as of "mixed blood." U.S. Department of Commerce, *Federal And State Indian Reservations* 197 (1971). Assiniboin occupy the southwestern portion of the Reservation, the Sioux occupy the southeastern part. *Id.* There are about 6,000 Indians enrolled in tribes, about 6,000 Indian residents not so enrolled, and over 10,000 non-Indians. *Id.* 198. Judge Shanstrom was familiar with the reservation as he had presided over at least one trial in which the effect of marijuana on the reservation was relevant to sentencing. *United States v. Colder,* CR 92–32–BLG–JDS–03 (November 11, 1992).

We defer to the court's judgment of credibility of the explanation for the peremptory, *id.,* but when the court, as here, makes no findings and gives no reasons, we have not much to guide us as to the court's thinking. The court was aware that no juror had indicated any knowledge whatsoever of Arlie Shields. Consequently, it was pure imagination on the part of the government that the two American Indian members of the venire were or might be anti-Arlie Shields. Hence this explanation, unsupported by any facts before the district court, should have been seen as pretextual. The defendants had pointed out that, when specifically asked by the court whether anyone knew Arlie Shields, no juror had responded. Tony Martell was in the jury pool when the court asked that question. Elvira Low Dog was not called to the jury until later in the proceedings, but she was present in the courtroom when the court asked whether anyone knew Shields; when, after she'd been called to the jury, the court asked whether there was any reason she could not be fair and impartial, she had responded, "No." The prosecutor told the court that to question individual Indian jurors about Shields might be "getting into sounding like a racial type question." But the prosecution by avoiding asking individual persons about Shields pro-

duced the worse result of disqualifying a whole group on a racial basis.

The government also referred to prosecution of "individual members of the Tribe" and of "several tribal members." As the court was aware from the points made by defense counsel, there are members of more than one tribe in the Wolf Point area. The court was informed that Ms. Low Dog might be Assiniboin, Sioux or Crow. The court was not informed what "tribal members" the government had prosecuted. It was nonsensical for the government to refer to the "Tribe" and to speak of the prosecution of "several tribal members" without identifying the particular tribe or tribes involved. The very use of the term "the Tribe" reflects a mentality treating all Indians alike. The objection assumes that a Crow will resent the prosecution of a Sioux, that an Assiniboin will have a fellow-feeling with a Crow. The objection reveals not a fear of tribal sympathy but a belief that "the Indians," taken collectively, will be hostile to the government. As defense counsel pointed out to the court, the government's response on this score was scarcely more than an admission of racial antipathy.

Finally, the government's response as to Martell was perfunctory to the point of implausibility. The prosecutor wasn't sure where he lived and even hedged his guesses with an "as I recall." At best, the prosecutor raised the possibility that Martell came from an area where "the Tribe" had been prosecuted; and that response has already been analyzed as discriminatory. The prosecutor signally failed to point to any individual characteristic of the two Native Americans he had challenged. The only characteristics alleged were group stereotypes that served as pretextual surrogates for racial discrimination. *See United States v. Bishop,* 959 F.2d 820, 825–26 (9th Cir.1992) (striking a black juror who lived in a community in which other blacks lived on the assumption he would sympathize with a black defendant is "precisely the kind of act[ ] prohibited" by *Batson* ).

The majority lifts language from *Burks v. Borg,* 27 F.3d 1424, 1429 (9th Cir.1994), to the effect that "counsel is entitled to use his full professional judgment" in exercising peremptories. The quotation comes from a paragraph dealing with counsel "making credibility determinations." *Id.* To make credibility determinations a prosecutor must do more than observe the racial characteristics of a juror. The prosecutor's explanations here did not involve any credibility determination. The explanations simply misinformed the trial court.

The majority opinion stresses the deference we owe the trial court. But *Batson* operates as a restraint on counsel who for illegitimate reasons seek to exercise a peremptory. Here the prosecutor invented an entity "The Tribe" to explain his challenge. The trial court was thereby misinformed as to the basis of the challenge. The prosecutor compounded this misinformation by suggesting that the challenged jurors were connected with Arlie Shields. The prosecutor had no basis for this suggestion. Again the trial court was misinformed.

What was defense counsel's obligation in the face of this misinformation? As clearly as words could, counsel pointed out to the trial court the racial nature of the prosecutor's explanations: "every single Native American Indian must be stricken as a juror. He admits to it, your honor." Counsel's argument was absolutely accurate. When the court ignored it and without any explanation rejected counsel's objection, there was no duty on the part of counsel to rescue the court from the error that the prosecution and the court's own view-point produced. As the language already quoted from *Purkett* indicates, the defendant may meet his burden of proof by showing that the prosecutor's objections are implausible. *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771. The defense made this showing.

*Batson* error cannot be harmless when it is structural, denying the defendants a jury composed of members of the community without any portion of the community being discriminated against. *Batson,* 476 U.S. at 100, 106 S.Ct. at 1725. The error deprives the defendants of their constitutional right to a trial by a jury fairly drawn. It deprives the defendants of the equal protection of the laws. It deprives the discriminated-against members of the community of their right to

participate in the process. *Id.* at 86–87, 106 S.Ct. at 1717–18.

## ORDER

May 20, 1996

The opinion filed on February 2, 1996 is amended as follows:

[Amendments incorporated for purpose of publication.]

Appellants' motions to permit citation to *Hernandez v. Lewis* are denied. Judge Noonan would grant the motions.